IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KENDA M. BATES, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 07-074-JJF |
| | : |
| MICHAEL J. ASTRUE[1], | : |
| Commissioner of Social | : |
| Security, | : |
| | : . |
| Defendant. | : |

Steven L. Butler, Esquire of LAW OFFICES OF GARY LINARDUCCI, New
Castle, Delaware.
Attorney for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney, and David F.
Chermol, Esquire, Special Assistant United States Attorney, of
the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.
Of Counsel: Michael McGaughran, Esquire, Regional Chief Counsel,
Region III, and Tara A. Czekaj, Esquire, Assistant Regional
Counsel of the SOCIAL SECURITY ADMINISTRATION, Philadelphia,
Pennsylvania.
Attorneys for Defendant.

**MEMORANDUM OPINION**

April 11, 2008
Wilmington, Delaware

---

[1]      On February 12, 2007, Michael J. Astrue became the
Commissioner of Social Security. Accordingly, pursuant to Fed.
R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for the
former Commissioner JoAnne B. Barnhart.

Joseph J. Farnan Jr.
**Farnan, District Judge.**

Presently before the Court is an appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c), filed by Plaintiff, Kenda M. Bates, seeking review of the final administrative decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and XVI, respectively, of the Social Security Act. 42 U.S.C. §§ 401-433, 1381-1383f. Plaintiff has filed a Motion For Summary Judgment (D.I. 17) requesting the Court to enter judgment in her favor. In response to Plaintiff's Motion, Defendant has filed a Cross-Motion For Summary Judgment (D.I. 19) requesting the Court to affirm the Commissioner's decision. For the reasons set forth below, Defendant's Cross-Motion For Summary Judgment will be granted and Plaintiff's Motion For Summary Judgment will be denied. The decision of the Commissioner dated April 15, 2005, will be affirmed.

## BACKGROUND

### I.   Procedural Background

Plaintiff protectively filed an application for DIB and SSI on December 30, 2003, alleging a disability onset date of December 1, 2002, due to residuals from a left kidney removal, back pain, and depression. Plaintiff's application was denied initially and upon reconsideration. Thereafter, Plaintiff

1

requested a hearing before an administrative law judge (the
"A.L.J."). On April 15, 2005, the A.L.J. issued a decision
denying Plaintiff's application for DIB and SSI. (Tr. 18-38).
Following the unfavorable decision, Plaintiff filed a timely
Request For Review Of Hearing Decision/Order. (Tr. 16-17). On
September 22, 2006, the Appeals Council denied Plaintiff's
request for review (Tr. 7-9), and the A.L.J.'s decision became
the final decision of the Commissioner. Sims v. Apfel, 530 U.S.
103, 107 (2000).

    After completing the process of administrative review,
Plaintiff filed the instant civil action pursuant to 42 U.S.C. §§
405(g) and 1383(c), seeking review of the A.L.J.'s decision
denying her claim for DIB and SSI. In response to the Complaint,
Defendant filed an Answer (D.I. 12) and the Transcript (D.I. 14)
of the proceedings at the administrative level.

    Thereafter, Plaintiff filed a Motion For Summary Judgment
and Opening Brief in support of the Motion. In response,
Defendant filed a Cross-Motion For Summary Judgment and a
combined opening brief in support of his Cross-Motion and
opposition to Plaintiff's Motion requesting the Court to affirm
the A.L.J.'s decision. Plaintiff has filed a Reply Brief, and
therefore, this matter is fully briefed and ripe for the Court's
review.

## II.  Factual Background

### A.  Plaintiff's Medical History, Condition and Treatment

At the time of the A.L.J.'s decision, Plaintiff was forty years old.  She has a high school education, one year of college, and past work experience as a retail store clerk, donut shop worker, file and law clerk, fast food worker, and housekeeper. (Tr. 22, 70, 75, 81, 85, 561-569).  Plaintiff's last employment ended in December 2002, when she quit her job.  (Tr. 562, 570). Plaintiff denied further employment, but records from her physicians show that she continued to work past this date.  (Tr. 177).  Specifically, Plaintiff reported to several physicians that she was working and requested excuse from work notes on several occasions.  (Tr. 217-222, 271, 277-289, 402-404).

In August 1997, Plaintiff underwent an MRI of her cervical spine, which revealed a moderate posterolateral disc herniation on the right at C6-7.  (Tr. 235).  A November 1997 cervical myelogram revealed a small extradural defect at the level of C5-6 which suggested a small disc herniation with no spinal stensosis. (Tr. 233).  In December 1998, Plaintiff underwent an anterior cervical fusion.  In a follow-up visit after the procedure, Plaintiff reported that her neck was "100% better."  (Tr. 314).

In May 1999, Plaintiff donated her left kidney to her boyfriend's grandfather.  (Tr. 136-139).  Plaintiff experienced no complications from the procedure.  (Tr. 137).

In November 2002, Plaintiff was seen for emergency treatment at Nanticoke Memorial Hospital due to vomiting, dizziness and severe abdominal pain.  Plaintiff's laboratory tests were negative.  Her condition improved with medication and fluids and she was released from the hospital the next day.  (Tr. 155-159).

In February 2004, a year and a half later, Plaintiff sought treatment with Domingo G. Aviado, M.D., for right flank pain and anxiety.  (Tr. 231).  X-rays of Plaintiff's spine were normal. (Tr. 230, 229-230).  Dr. Aviado prescribed pain medication.  One month later, Plaintiff reported the medication was "helping" but her pain had not fully resolved.  (Tr. 224).  Dr. Aviado referred Plaintiff to physical therapy.  (Tr. 223).  Plaintiff continued to report increased anxiety due to the ailing health of her mother.  (Tr. 287).

On March 31, 2004, Plaintiff underwent a consultative evaluation with Joseph B. Keyes, Ph.D.  (Tr. 178-179).  Dr. Keyes found Plaintiff's speech to be clear and easy to understand.  Her thinking was organized and relevant to the situation.  She had no delusions, her immediate working memory and remote memory were intact, and her concentration and attention were adequate. Plaintiff was oriented to person, place, situation and time and demonstrated appropriate social skills during the evaluation, but Dr. Keyes found her social skills to be limited.  Plaintiff reported no friendships, crying episodes, lack of motivation,

4

loss of energy, and no interests or activities. She reported
that she sits home most of the time doing nothing. She was
socially withdrawn with a flat affect and sad mood. Dr. Keyes
noted that Plaintiff was independent in her self-care and able to
perform household/domestic chores. Dr. Keyes diagnosed Plaintiff
with Major Depressive Disorder, Recurrent, Moderate; borderline
personality disorder, and alcohol/polysubstance dependence in
full remission. (Tr. 179). Dr. Keyes completed an RFC form for
Plaintiff indicating that she was: (1) moderately severely
limited in her ability to relate to other people; (2) moderately
limited in her ability to sustain work performance in a normal
work setting, cope with pressures of work and perform routine,
repetitive tasks under ordinary supervision; (3) mildly limited
in her daily activities, ability to carry out instructions, and
constriction of interests; and (4) not limited in the areas of
deterioration of personal habits and her ability to understand
simple, primary, oral instructions. (Tr. 181-182).

    In April 2004, Plaintiff underwent a consultative
examination with Julio Depena, M.D. (Tr. 184-190). Plaintiff
reported frequent back pain in the cervical spine and past
migraine headaches, but denied any current joint pain, stiffness,
headaches, numbness, tingling or muscle weakness. Plaintiff
reported that she suffered from depression in the past and
experiences crying spells, panic attacks, anxiety and auditory

5

hallucinations. Plaintiff's physical examination was essentially normal and revealed no abnormalities in the neck, including good range of motion. Her neurological examination was normal. Her muscle strength was normal with no signs of atrophy or spasm. A musculoskeletal examination revealed no range of motion abnormalities. Dr. Depena noted that Plaintiff had signs of depression, generalized anxiety disorder and signs of schizophrenia of the simple type. Dr. Depena recommended further psychiatric evaluation.

From April 2004 through January 2005, Plaintiff treated with Dr. Aviado monthly. (Tr. 217-222, 277-289). During this time, Plaintiff continued to report depression, crying spells, neck and back pain, and problems with her hands. Plaintiff reported that Zoloft was helping, but did not relieve all her symptoms. Dr. Aviado referred Plaintiff to other specialists during this time, and provided her with four work excuse notes.

In May 2004, Plaintiff's medical records were reviewed by Carlene Tucker-O'Kine, Ph.D, a state agency physician. (Tr. 205-207). Dr. O'Kine found that Plaintiff had no more than moderate limitations in the areas of mental work functioning. Dr. O'Kine questioned Plaintiff's credibility, because there was no evidence of delusional thoughts or hallucinations when she was examined, yet she reported auditory hallucinations. Dr. O'Kine concluded that Plaintiff could manage low stress tasks.

6

In June 2004, Plaintiff treated with Joel M. Rutenberg, M.D., a neurologist, to whom she was referred by Dr. Aviado for her neck pain and left arm numbness. (Tr. 212-214). Upon physical examination, Dr. Rutenberg noted increased tone in the posterior cervical and upper trapezius areas, which was worse on the left, and limited cervical extension and lateral rotation to either side. Plaintiff was guarded during strength testing of her left arm and had some "giveaway" weakness involving the abductor pollicis brevis muscles. She had hypalgesia to pinprick involving the entire left hand and part of the forearm that was not physiologic. She also had hypalgesia involving the right second digit, and a positive Tinel's sign over the median nerve at the wrists. Despite the giveaway weakness in her left arm, Dr. Rutenberg could not demonstrate any major focal abnormalities. He diagnosed her with carpal tunnel syndrome, as well as likely cervical radiculopathy. He recommended a cervical MRI and EMG of the left, upper extremity.

The EMG revealed moderate to severe median neuropathy affecting both wrists consistent with carpal tunnel syndrome, especially on the left, and possible minimal chronic C7 root irritation, which might be a residual from her previous surgery. (Tr. 209). An MRI of her cervical spine showed surgical changes at C6-7 without recurrent disk herniation or evidence of car formation, and a diffuse disk bulge at C5-6, which was slightly

7

more prominent towards the left.  No involvement of the lateral recess or nerve root canal was apparent.  (Tr. 211).  As a result of her cervical and carpal tunnel syndrome, Dr. Rutenberg opined that Plaintiff could not work until her symptoms improved.  (Tr. 210).  Dr. Rutenberg also referred Plaintiff to an orthopedic surgeon for left carpal tunnel release.  (Tr. 209).

In August 2004, Plaintiff was examined by Harry M. Freedman, M.D., an orthopedic surgeon.  Plaintiff reported to Dr. Freedman, that she worked for a cleaning lady, but could no longer work due to carpal tunnel syndrome and morning stiffness of the knee, ankle, and hands with pain and swelling.  Dr. Freedman's impressions included bilateral median nerve entrapment at the wrist confirmed on nerve conduction studies and possible sero-negative rheumatoid arthritis.  (Tr. 289).  Dr. Freedman recommended a short course of medication and advised Plaintiff to return in two weeks.  When she returned, Plaintiff indicated that she was beginning to experience some relief of her generalized arthralgias, but was experiencing jaw pain.  (Tr. 295).  Dr. Freedman referred Plaintiff to Ivonne Herrera. M.D., a rheumatologist.  Dr. Freedman also provided Plaintiff with several work excuse notes from August through November 2004.

In August 2004, Plaintiff's medical records were reviewed by Janet Brandon, Ph.D., a state agency reviewing psychologist. Like Dr. O'Kine, Dr. Brandon opined that Plaintiff had no more

8

than moderate limitations in any areas of mental work
functioning. (Tr. 238-240). Dr. Brandon questioned Plaintiff's
credibility noting that she complained of hand pain, but does
some home painting which evidences the use of her hands. Dr.
Brandon found that Plaintiff retained the ability to perform
simple tasks. (Tr. 253-254). Another state agency physician
also agreed with Dr. Brandon's assessment. (Tr. 265-268).

In September 2004, Plaintiff treated with Dr. Herrera for
her complaints of polyarthralgias and carpal tunnel syndrome.
(Tr. 406-408). A musculoskeletal examination revealed multiple
tender points throughout Plaintiff's body, including her joints.
Dr. Herrera concluded that Plaintiff was most likely suffering
from fibromyalgia. Based on the lack of evidence of inflammatory
arthritis and normal blood test results, Dr. Herrera did not
believe Plaintiff had rheumatoid arthritis. Plaintiff requested
Dr. Herrera to provide her with a work excuse note for a
prolonged period of time, but Dr. Herrera declined and instead
referred Plaintiff to her primary care physician. (Tr. 264,
408).

Plaintiff's medical records were reviewed by Charles Riegel,
M.D., a state agency physician, in September 2004. (Tr. 257-
263). Dr. Riegel opined that Plaintiff retained the ability to
perform work at the light exertional level, finding that she
could lift up to twenty pounds occasionally and ten pounds

9

frequently, sit for six hours in an eight hour day, and stand/walk for six hours in an eight hour day. Dr. Riegel opined that Plaintiff had a limited ability to push and pull with the upper extremities and recommended restrictions from more than occasional climbing and crawling, as well as limited reaching in all directions with the left arm and restrictions on avoiding extreme cold and hazards. In October 2004, another state agency physician agreed with Dr. Riegel's assessment but added manipulative restrictions due to carpal tunnel syndrome. (Tr. 269-270).

In October 2004, Plaintiff returned to Dr. Herrera. Dr. Herrera noted extreme tenderness in Plaintiff's joints and multiple tender points in her back, upper chest, left trapezius muscle, lower back, hips and knees. He gave her a one time prescription for Percocet and suggested that she begin physical therapy. He provided her with a work excuse note for 4 weeks while she tried physical therapy. Dr. Herrera referred Plaintiff to Kartik Swaminathan, M.D., a physical medicine and rehabilitation specialist. (Tr. 402-404).

Plaintiff attended physical therapy for one month. She then reported that an unspecified doctor told her to discontinue therapy pending cervical spine surgery. (Tr. 304-313).

In October 2004, Plaintiff was examined by Dr. Swaminathan. (Tr. 292). Dr. Swaminathan noted diminished range of motion of

10

the cervical spine, significant tenderness over the cervical spine, and weakness of bilateral grip strength. Dr. Swaminathan diagnosed Plaintiff with chronic cervical facet arthropathy with cervical radiculopathy and secondary myofascial pain, chronic lumbar arthropathy and bilateral carpal tunnel syndrome. Dr. Swaminathan recommended trigger point injections, which he provided in October 2004 and January 2005. (Tr. 336-337). Dr. Swaminathan also referred Plaintiff to a psychiatrist for management of her chronic pain. Dr. Swaminathan also provided a work excuse note for a period of six months due to severe neck pain and bilateral carpal tunnel syndrome. (Tr. 271).

In November 2004, Plaintiff returned to Dr. Herrera, who completed a residual functional capacity form for Plaintiff. (Tr. 391-396). Dr. Herrera noted that Plaintiff's pain was severe enough to frequently interfere with her attention and concentration. Dr. Herrera went on to determine that Plaintiff was capable of performing low stress jobs, but he identified physical limitations that would preclude her from performing all work. For example, he opined that she could only sit for 30 minutes at a time and stand for fifteen minutes at a time. He found she should never lift anything more than ten pounds and he limited her ability to twist, turn, reach and perform fine manipulations to no more than ten percent of the work day. He also opined that she would be likely to miss more than four days

11

of work per month.

In December 2004, Plaintiff was examined by Jeanette M.S. Zaimes, M.D., a psychiatrist. (Tr. 300-302). Plaintiff reported to Dr. Zaimes that she was experiencing symptoms of obsessive compulsive disorder, including obsessively cleaning all day, washing her hands and brushing her teeth. She also reported urges to kill her loved ones. Dr. Zaimes diagnosed Plaintiff with major depressive disorder recurrent, severe without psychosis and obsessive compulsive disorder. Medication was prescribed.

In January 2005, Dr. Zaimes completed a mental impairment questionnaire on behalf of Plaintiff. (Tr. 272-276). She noted her diagnosis as set forth above, and assigned Plaintiff a GAF of 55, with a highest of 60 in the past year, which indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. The American Diagnostic Association Diagnostic & Statistical Manual of Mental Disorders, 32 (4th ed. 1994). Dr. Zaimes notes that Plaintiff had not returned since her initial evaluation a month prior. Dr. Zaimes indicated that Plaintiff did not experience side effects from her medications, and opined that Plaintiff would be absent from work more than three days per month due to her impairments. She also identified numerous restrictions that would preclude Plaintiff from performing all work, including poor or no ability to maintain

regular attendance and complete a normal workday; constant deficiencies in concentration, persistence and pace; and repeated episodes of decompensation in the work setting.

In February 2005, Plaintiff followed up with Dr. Zaimes. She reported that she was still experiencing obsessive compulsive symptoms like handwashing and cleaning. Her medications were increased. (Tr. 299).

Dr. Swaminathan also completed a physical residual functional capacity questionnaire for Plaintiff in February 2005. (Tr. 417-420). Dr. Swaminathan also found restrictions that would preclude Plaintiff from working. For example, he found that Plaintiff was limited to siting nor more than two hours and standing/walking no more than two hours in an eight hour day. However, he did not impose any limitations on reaching, handling or fingering. (Tr. 420).

Also in February 2005, Plaintiff treated with Dr. Freedman who noted that Plaintiff had a positive Finkelstein's test. Dr. Freedman directed Plaintiff to see Magdy Boulos, M.D., a neurosurgeon, for a cervical discectomy to relieve her neck pain and radiculopathy. (Tr. 422).

On April 14, 2005, the day before the A.L.J. issued his decision in this case, Plaintiff was evaluated by Dr. Boulos. (Tr. 518-528). Dr. Boulos noted stiffness, tightness and guarding the cervical area. He indicated limitations in her

13

cervical range of motion in flexion, extension and bending.  She had paresthesias in the left arm and weakness in her handgrips and biceps.  He diagnosed Plaintiff with cervical radiculopathy and suggested a new MRI and EMG.

In November 2005, after the A.L.J. issued his decision, Dr. Boulos completed a cervical spine residual functional capacity form for Plaintiff noting the limited range of motion findings and concluding that Plaintiff would experience pain or other limitations which are severe enough to frequently interfere with the attention and concentration needed to perform even simple work tasks.  (Tr. 524-528).  However, Dr. Boulos did not complete significant portions of the form noting that Plaintiff had not been seen since May 2005.

In December 2005,  Dr. Herrera, Dr. Swaminathan, Dr. Freedman and Dr. Aviado completed additional residual functional capacity forms indicating that Plaintiff would be unable to perform any full-time sedentary work.  All of these doctors opined that Plaintiff would miss multiple days of work per month and was limited in her ability to sit, stand and use her arms repetitively.  Dr. Freedman also completed a certification for the State of Delaware Division of Health and Social services indicating that Plaintiff would be unable to perform any work for more than 12 months due to her impairments.  (Tr. 530-532, 534-539, 542-544, 548-550).

14

B.    The A.L.J.'s Decision

In her disability applications forms, Plaintiff indicated that she was only able to cook simple items like soup and that she relied on her boyfriend for performing most of the household chores.  She indicated that she was depressed, could not remember or understand what she read, and did not visit with any friends or relatives.  She also stated that her medications caused side effects like drowsiness, nervousness, mental confusion, fatigue and sweaty palms.  (Tr. 90-96).

At the hearing, Plaintiff was represented by counsel.  She testified that she is able to drive, but only for short distances.  (Tr. 560).  She admitted that she obtained Medicaid coverage in February 2004, but did not seek mental health treatment until December 2004 even though she knew she could obtain treatment through free clinics.  (Tr. 600).  Plaintiff also acknowledged that she did not seek treatment for her neck injury from 1998 until early 2004.  (Tr. 581-582).  Plaintiff also complained of vision problems in her left eye during an episode of physical abuse in 2001, but there were no medical findings on examination during this time frame.  (Tr. 589).  Plaintiff testified that she prepares simple meals, performs light household chores like cleaning the counters, changing sheets and washing clothes, and picking up items from the grocery store.  (Tr. 595-596).

15

Without objection by Plaintiff's counsel, a vocational
expert testified by phone due to inclement weather.  (Tr. 609-
614).  The A.L.J. asked the vocational expert to consider
Plaintiff's age, education, and work experience, as well as the
fact that she would be limited to simple unskilled, low-stress
work at the light exertional level that would require only
occasional climbing, limited reaching in all directions,
including overhead with the left upper extremity, and avoidance
of concentrated exposure to hazards and cold.  The vocational
expert identified the positions of non-precision assembler and
hand packer in both the light and sedentary range and testified
that significant numbers of these jobs exist in the national
economy.

In his decision dated April 15, 2005, the A.L.J. found that
Plaintiff suffered from depression, anxiety, carpal tunnel
syndrome, fibromyalgia and cervical degenerative disc disease,
which are severe impairments, but do not meet or equal, alone or
in combination, a listed impairment.  The A.L.J. also found that
Plaintiff's testimony regarding her limitations was not fully
credible.  The A.L.J. then determined that Plaintiff had the
residual functional capacity to stand, walk or sit for six hours
in an eight hour day, lift/carry 20 pounds occasionally and ten
pounds frequently, limited pushing/pulling in the upper
extremities, limited reaching in all directions, occasional

16

climbing and crawling and no concentrated exposure to cold and
hazards.  The A.L.J. further limited Plaintiff to simple,
unskilled jobs which are low stress, which is defined as work
requiring only occasional decision-making.  Using Medical-
Vocational Rule 202.20 as a framework, the A.L.J. concluded that
Plaintiff could perform a significant number of jobs in the
national economy.  Accordingly, the A.L.J. concluded that
Plaintiff was not under a disability within the meaning of the
Act.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), findings of fact made by the
Commissioner of Social Security are conclusive, if they are
supported by substantial evidence.  Accordingly, judicial review
of the Commissioner's decision is limited to determining whether
"substantial evidence" supports the decision.  Monsour Medical
Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).  In making
this determination, a reviewing court may not undertake a de novo
review of the Commissioner's decision and may not re-weigh the
evidence of record.  Id.  In other words, even if the reviewing
court would have decided the case differently, the Commissioner's
decision must be affirmed if it is supported by substantial
evidence.  Id. at 1190-91.

The term "substantial evidence" is defined as less than a
preponderance of the evidence, but more than a mere scintilla of

17

evidence.  As the United States Supreme Court has noted

substantial evidence "does not mean a large or significant amount

of evidence, but rather such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  <u>Pierce</u>

<u>v. Underwood</u>, 487 U.S. 552, 555 (1988).

        With regard to the Supreme Court's definition of

"substantial evidence," the Court of Appeals for the Third

Circuit has further instructed, "A single piece of evidence will

not satisfy the substantiality test if the [Commissioner] ignores

or fails to resolve a conflict created by countervailing

evidence.  Nor is evidence substantial if it is overwhelmed by

other evidence . . . or if it really constitutes not evidence but

mere conclusion."  <u>Kent v. Schweiker</u>, 710 F.2d 110, 114 (3d Cir.

1983).  Thus, the substantial evidence standard embraces a

qualitative review of the evidence, and not merely a quantitative

approach.  <u>Id.</u>; <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981).

                          **DISCUSSION**

**I.    Evaluation Of Disability Claims**

        Within the meaning of social security law, a "disability" is

defined as the inability to do any substantial gainful activity

by reason of any medically determinable physical or mental

impairment, which can be expected to result in death, or which

has lasted or can be expected to last, for a continuous period of

                                                              18

not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A),
1382(c)(a)(3).  To be found disabled, an individual must have a
"severe impairment" which precludes the individual from
performing previous work or any other "substantial gainful
activity which exists in the national economy."  20 C.F.R. §§
404.1505, 416.905.  In order to qualify for disability insurance
benefits, the claimant must establish that he or she was disabled
prior to the date he or she was last insured.  20 C.F.R. §
404.131, Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).  The
claimant bears the initial burden of proving disability.  20
C.F.R. §§ 404.1512(a), 416.912(a); Podeworthy v. Harris, 745 F.2d
210, 217 (3d Cir. 1984).

In determining whether a person is disabled, the Regulations
require the A.L.J. to perform a sequential five-step analysis.
20 C.F.R. §§ 404.1520, 416.920.  In step one, the A.L.J. must
determine whether the claimant is currently engaged in
substantial gainful activity.  In step two, the A.L.J. must
determine whether the claimant is suffering from a severe
impairment.  If the claimant fails to show that his or her
impairment is severe, he or she is ineligible for benefits.
Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

If the claimant's impairment is severe, the A.L.J. proceeds
to step three.  In step three, the A.L.J. must compare the
medical evidence of the claimant's impairment with a list of

19

impairments presumed severe enough to preclude any substantial gainful work.  Id. at 428.  If the claimant's impairment meets or equals a listed impairment, the claimant is considered disabled. If the claimant's impairment does not meet or equal a listed impairment, the A.L.J.'s analysis proceeds to steps four and five.  Id.

In step four, the A.L.J. is required to consider whether the claimant retains the residual functional capacity to perform his or her past relevant work.  Id.  The claimant bears the burden of establishing that he or she cannot return to his or her past relevant work.  Id.

In step five, the A.L.J. must consider whether the claimant is capable of performing any other available work in the national economy.  At this stage the burden of production shifts to the Commissioner, who must show that the claimant is capable of performing other work if the claimant's disability claim is to be denied.  Id.  Specifically, the A.L.J. must find that there are other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's medical impairments, age, education, past work experience and residual functional capacity.  Id.  In making this determination, the A.L.J. must analyze the cumulative effect of all of the claimant's impairments.  At this step, the A.L.J. often seeks the assistance of a vocational expert.  Id. at 428.

## II.   Whether The A.L.J.'s Decision Is Supported By Substantial Evidence

By her Motion, Plaintiff contends that the A.L.J.'s decision is not supported by substantial evidence.  Plaintiff contends that the A.L.J. erred in assessing her residual functional capacity, and denied her due process rights because the vocational expert was unable to adequately testify by telephone. With respect to the assessment of her residual functional capacity, Plaintiff specifically contends that the A.L.J. erred in (1) assessing her credibility and subjective complaints, (2) failing to include certain nonexertional limitations and other limitations identified by DDS physicians in her RFC evaluation of Plaintiff, and (3) failing to properly evaluate the medical opinions of her treating physicians, and instead giving the opinions of non-examining state agency physicians more weight. The Court will analyze each of Plaintiff's arguments in turn.

### A.   Whether The A.L.J. Erred In Assessing Plaintiff's Credibility

Generally, the A.L.J.'s assessment of a plaintiff's credibility is afforded great deference, because the A.L.J. is in the best position to evaluate the demeanor and attitude of the plaintiff.  See e.g. Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001); Griffith v. Callahan, 138 F.3d 1150, 1152 (7th Cir. 1998); Wilson v. Apfel, 1999 WL 993723, *3 (E.D. Pa. Oct. 29, 1999).  However, the A.L.J. must explain the reasons for his or

21

her credibility determinations. <u>Schonewolf v. Callahan</u>, 972 F. Supp. 277, 286 (D.N.J. 1997) (citations omitted). Factors the A.L.J. must consider in evaluating the veracity of a claimant's subjective complaints of pain include, among other things, consideration of Plaintiff's daily activities; the location, duration, frequency and intensity of pain and other symptoms; the type, dosage, effectiveness and side effects of medication; other treatment methods used by the claimant and other factors concerning the claimant's functional limitations due to pain. 20 C.F.R. §§ 404.1529; 416.929.

Plaintiff suggests that the A.L.J. improperly rejected her complaints of pain based on her observations of Plaintiff at the hearing and improperly rejected her complaints even though there was no countervailing evidence to the contrary. In her decision, however, the A.L.J. did not refer to her own personal observations and instead concluded that Plaintiff's allegations regarding her limitations were not entirely credible, because they were inconsistent with the medical evidence of record and the Plaintiff's activities of daily living. The Court concludes that the A.L.J.'s decision is not erroneous and is supported by substantial evidence. Plaintiff reported in her disability applications that she had not worked since December 2002; however, Plaintiff informed her physicians on numerous occasions during her examinations that she continued to work well into

22

2004. Indeed, Plaintiff received numerous work excuse notes from her physicians. In addition, Plaintiff reported on disability forms and testified during the hearing that her boyfriend did most of the household chores, but she reported to Dr. Zaimes on multiple occasions that she cleans obsessively. In addition, she told Dr. Freedman that she worked for a cleaning lady, which belies her contention that she was unable to perform most household chores. Plaintiff also testified that she suffered from mental health problems for years, but she received no treatment until December 2004, even though she knew she could obtain treatment through free clinics and obtained Medicaid in February 2004. Likewise, Plaintiff contends that she suffered from neck pain from 1998, but the record reflects that she did not seek treatment until April 2004. Plaintiff also made numerous inconsistent statements to her treating physicians. For example, Plaintiff testified that she experienced headaches twice a day, but she denied experiencing headaches when she saw Dr. Depena. Plaintiff also reported auditory hallucinations to some of the mental health professionals she saw, but not others. Moreover, those mental health professionals to whom she reported auditory hallucinations could not discern any evidence suggesting that Plaintiff suffered from hallucinations. Given the gaps in her treatment, as well as the significant inconsistencies between Plaintiff's testimony regarding her work history and daily

activities and her reports to her physicians, the Court cannot
conclude that the A.L.J. erred in declining to fully credit
Plaintiff's testimony.

> B.    Whether The A.L.J. Erred In Failing To Include In
>       Plaintiff's RFC Certain Nonexertional And Other
>       Limitations Identified By DDS Physicians

A claimant's RFC is "that which an individual is still able
to do despite the limitations caused by his or her
impairment[s]."  Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir.
2001) (citation omitted).  When determining an individual's RFC
at step four of the sequential evaluation, the A.L.J. must
consider all relevant evidence including medical records,
observations made during medical examinations, descriptions of
limitations by the claimant and others, and observations of the
claimant's limitations by others.  Id.  Before an individual's
RFC can be expressed in terms of an exertional level of work, the
A.L.J. "must first identify the individual's functional
limitations or restrictions and assess his or her work related
abilities on a function by function basis."  SSR 96-8p.  The RFC
must also address both the exertional and non-exertional
capacities of the individual.  Id.  Non-exertional capacity
refers to "all work-related limitations and restrictions that do
not depend on an individual's physical strength," such as
limitations which are psychological or mental in nature.  Id.; 20
C.F.R. § 1469(a)(c) (listing examples of non-exertional limitations).

24

The A.L.J.'s RFC assessment must "be accompanied by a clear
and satisfactory explanation of the basis on which it rests."
Fargnoli, 247 F.3d at 41. In weighing the evidence, the A.L.J.
must give some indication of the evidence which he or she rejects
and his or her reason for discounting the evidence. Burnett v.
Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000); see
also SSR 96-8p. "In the absence of such an indication, the
reviewing court cannot tell if significant probative evidence was
not credited or simply ignored." Cotter v. Harris, 642 F.2d 700,
705 (3d Cir.1981). The responsibility for formulating an RFC
rests exclusively with the A.L.J., and the RFC finding is
considered an administrative finding and not a medical opinion.
SSR 96-50, 1996 WL 374183 (1996).

With respect to the A.L.J.'s assessment of Plaintiff's RFC,
Plaintiff contends that the A.L.J. erred in failing to adopt all
of the limitations identified by the state agency physicians,
whom the A.L.J. found to be credible. Specifically, Plaintiff
contends that a DDS physician on October 8, 2004, found that
Plaintiff would experience additional manipulative limitations as
a result of her carpal tunnel syndrome, but the A.L.J. failed to
include such limitations in his hypothetical to the vocational
expert. In addition, a state agency psychologist opined on
August 24, 2004, that Plaintiff would have moderate limitations
in certain mental functions required for work like the ability to

25

maintain attention and concentration; the ability to understand,
remember and carry out detailed instructions, and the ability to
complete a normal work day or work week without interruption from
psychologically based symptoms.  These and other moderate
limitations were echoed in a May 28, 2004 Psychiatric Review
Technique Report.

With respect to the moderate mental limitations identified
by the state agency physicians, the Court concludes that the
A.L.J. appropriately accounted for those limitations both in his
RFC assessment and in his hypothetical question to the vocational
expert.  Specifically, the A.L.J. limited Plaintiff to simple,
unskilled jobs which are low in stress, meaning that they
required only occasional decision making.  There is no
requirement that the A.L.J. name each and every limitation
checked on the diagnostic forms used by the state agency
physicians, if those limitations, are embodied in the narrative
supplied by the state agency physicians and used by the A.L.J. in
questioning the vocational expert.  See e.g., Lembke v. Barnhart,
2006 WL 3834104, *10 (W.D. Wis. Dec. 29, 2006) (recognizing that
if state agency psychologists translate their worksheet
observations into a narrative RFC assessment, it may be
sufficient to supply "the missing bridge between the evidence and
the ALJ's conclusion" and relying on Johansen v. Barnhart, 314
F.3d 283, 289 (7th Cir. 2002) for the proposition that the

26

"A.L.J.'s finding that plaintiff could perform repetitive, low-stress work was proper despite consulting psychologists' conclusion that plaintiff had 'moderate' limitations in 3-5 abilities listed summarily on mental RFC worksheet, because one consultant 'went further and translated those findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work'"). Indeed, courts have recognized that the purpose of the "Summary Conclusions" portion of the RFC form "is to provide a worksheet to the psychiatrist or psychologist examining the claimant to ensure all pertinent mental activities and the claimant's degree of limitation for sustaining these activities are adequately considered," and therefore, there is no requirement that the A.L.J. include every limitation identified on these worksheets. O'Connor-Spinner v. Astrue, 2007 WL 4556741 (S.D. Ind. Dec. 20, 2007 (citing POMS DI 25020.010, 2001 WL 1933437). Here, Dr. Brandon ultimately translated the limitations he identified in the Summary Conclusions section of the RFC form into an assessment that Plaintiff retained the RFC to perform simple tasks, which the A.L.J. in turn incorporated into his RFC assessment and his questions to the vocational expert. Accordingly, the Court concludes that the A.L.J. did not err in his treatment of Plaintiff's mental health limitations.

As for the A.L.J.'s decision to decline to include

27

Plaintiff's alleged limitations in fingering and feeling, the
Court notes that there is inconsistent evidence in the record
regarding this limitation among the reviewing state agency
physicians, as well as examining sources. For example, while it
is true that one state agency physician found that Plaintiff had
manipulative limitations, others did not, including Dr. Riegel
and Plaintiff's treating physician, Dr. Swaminathan (Tr. 259,
420). In any event, the A.L.J. considered manipulative
limitations by restricting Plaintiff's ability to lift, push,
pull and reach. While the A.L.J. did not further refine this
limitation to include fine fingering and dexterity, the Court
concludes that this decision was not erroneous in light of the
conflicting opinions on this issue. Moreover, while it is true
that the A.L.J. did not discuss this issue in the section of his
opinion crediting the state agency physicians, it is evident
elsewhere in the decision that he declined to credit further fine
fingering limitations based on Plaintiff's own testimony that she
was able to perform such tasks.[2] Accordingly, the Court
concludes that the A.L.J. did not err in declining to include a
specific manipulative limitation in his RFC assessment of

_____

[2]     Plaintiff testified that she could perform certain
manipulative tasks, but she also testified regarding pain
performing them and that it might take her a long time to perform
certain tasks. This latter aspect of Plaintiff's testimony goes
to her credibility regarding the severity of her symptoms. The
Court has previously concluded that the A.L.J. did not err in
declining to fully credit Plaintiff's testimony.

Plaintiff.

    C.    <u>Whether The A.L.J. Erred In Failing To Properly</u>
               <u>Evaluate The Medical Opinions Of Plaintiff's Treating</u>
               <u>Physicians And Instead Crediting The Opinions Of State</u>
               <u>Agency Physicians</u>

Although a treating physician's opinion is entitled to great weight, a treating physician's statement that a plaintiff is unable to work or is disabled is not dispositive. The A.L.J. must review all the evidence and may discount the opinions of treating physicians if they are not supported by the medical evidence, provided that the A.L.J. explain his or her reasons for rejecting the opinions adequately. <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 42 (3d Cir. 2001); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1067 (3d Cir. 1993).

In this case, the A.L.J. identified the proper standard for consideration of the opinions of Plaintiff's treating physicians, discussed those opinions and concluded that they were not entitled to significant weight. The Court concludes that the A.L.J.'s assessment was not erroneous. The opinions of Plaintiff's treating physicians reflect Plaintiff's statements regarding her condition and her subjective complaints. The A.L.J. properly evaluated Plaintiff's credibility and found her to be less than credible, therefore, the Court cannot conclude that the A.L.J. erred in declining to credit physicians' opinions which were based primarily on Plaintiff's subjective reports.

Indeed, Plaintiff gave her physicians conflicting reports about her condition, and as a result, the evaluations by her physicians were themselves conflicting. For example, Plaintiff reported to Dr. Herrera that she obtained no benefit from steroid injections, but she told Dr. Swaminathan the same month that she had obtained excellent relief. (Tr. 28, 332, 409). Dr. DePena found that Plaintiff had normal strength, but Dr. Rutenberg found "giveaway weakness" during Plaintiff's muscle test suggesting a lack of effort on the part of Plaintiff. Moreover, several of Plaintiff's treating physicians did not specify any functional limitations to support their opinions that Plaintiff was disabled, and the A.L.J. is not required to credit conclusory unsupported medical opinions of disability. Because the A.L.J. adequately explained his reasons for rejecting the opinions of Plaintiff's treating physician and because his decision to reject those opinions is supported by substantial evidence, the Court concludes that the A.L.J. did not err in his evaluation of the opinions of Plaintiffs' treating physicians.

As for the A.L.J.'s decision to credit the opinions of state agency physicians, the Court notes that state agency physicians and psychologists are considered highly qualified experts in the evaluation of medical issues in disability claims under the Act. Where, as here, the opinions of state agency physicians and psychologists are consistent with the record evidence as a whole,

the A.L.J. is entitled to rely on them and they are substantial
evidence supporting his decision.  Jones v. Sullivan, 954 F.2d
125, 128-129 (3d Cir. 1991); Rivera v. Barnhart, 239 F. Supp. 2d
413, 420 (D. Del. 2002).  Accordingly, the Court concludes that
the A.L.J. did not err in accepting the decisions of the state
agency physicians.

D.    Whether The A.L.J. Violated Plaintiff's Due Process
      Rights

To satisfy due process, a social security claimant is
entitled to a full and fair hearing, with an unbiased judge, such
that a record may be constructed containing relevant information
regarding the claimant's entitlement to social security benefits.
Ventura v. Shalala, 55 F.3d 900, 901-905 (3d Cir. 1995).
To demonstrate a due process violation, the plaintiff must show
that he or she was prejudiced by the alleged error.  See e.g.,
Chuculate v. Barnhart, 170 Fed. Appx. 583, 587 (10th Cir. 2006)
(rejecting claim of due process violation predicated on
administrative law judge's denial of permission to submit post-
hearing written question to vocational expert when "the ALJ's
failure to forward plaintiff's unsupported question does not
undermine confidence in the result in this case"); Adams v.
Massanari, 55 Fed. Appx. 279, 286 (6th Cir. 2003) ("Clearly, in
this case, the procedure used by the ALJ did not erroneously
deprive Appellant of her interest in the fair determination of
her eligibility for benefits, since the ALJ's decision to

31

withhold [a post-hearing] report from the ME [medical expert] had no determinative effect on the outcome of Appellant's hearing."); Kane v. Heckler, 731 F.2d 1216, 1220 (5th Cir. 1984) (claim of failure to develop full and fair record, like claim that hearing has been held in absence of waiver of right to counsel, requires showing that Social Security applicant "was prejudiced as a result of scanty hearing. She must show that, had the ALJ done his duty, she could and would have adduced evidence that might have altered the result.").

Plaintiff contends that her due process rights were violated because the A.L.J. allowed the vocational expert to testify by telephone due to inclement weather, and there was difficulty hearing some of the conversation. Specifically, the vocational expert stated that he only heard 90% of the opening colloquy, and the A.L.J had a brief conversation with the vocational expert during which the vocational expert's responses were not recorded on the record.

The Court has reviewed the hearing transcript and concludes that the deficiencies cited by the Plaintiff are insufficient to rise to the level of a due process violation in the circumstances of this case. First, the Court notes that Plaintiff's counsel did not object to the vocational expert's telephone participation at any time during the hearing despite the technical difficulties that occurred. In addition, Plaintiff's counsel had the

32

opportunity to cross-examine the vocational expert, and he could have inquired at any time regarding the vocational expert's ability to hear the proceedings. Further, it appears to the Court that the transcript is in tact during the relevant portions of the vocational expert's testimony. While it is true that the parties were unable to hear the vocational expert's answer to the question of whether he reviewed the record, Plaintiff's attorney could have inquired further of the vocational expert during cross-examination so that his response would have been more clearly recorded on the record. Plaintiff's attorney chose not to do so, and all indications from the record are that the vocational expert did review the record, since he went on to testify without difficulty regarding Plaintiff's condition. Accordingly, the Court concludes that Plaintiff has not established that she was prejudiced by any deficiencies during the hearing.

## CONCLUSION

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgment and deny Plaintiff's Motion For Summary Judgment. The decision of the Commissioner dated April 15, 2006, will be affirmed.

An appropriate Order will be entered.